## UNITED STATES v. CERTAIN PARCELS OF LAND IN RIVERSIDE COUNTY, CAL., et al.

### Civil Action No. 754 O'C.

District Court, S. D. California,
Central Division.
June 27, 1946.

Eugene D. Williams and Irl D. Brett, Sp. Assts. to Atty. Gen., both of Los Angeles, Cal., for the United States.

Robert W. Kenny, Atty. Gen., and Robert E. Reed, Deputy Atty. Gen., and C. C. Carleton, C. R. Montgomery, and Frank B. Durkee, all of Sacramento, Cal., for the State of California.

J. F. T. O'CONNOR, District Judge.

(1) *Introductory statement of the issues involved:*

This opinion of the Court deals exclusively with the controversy raised at the pre-trial hearing commencing on January 30, 1946, and lasting seven court days, between the Government of the United States and the State of California, on the clarification of the issues presented by the Government's amendment to complaints and amended complaints, filed December 20, 1945, in consolidated Action No. 754 O'C. Civil, and the answer of the State of California thereto, filed on January 8, 1946, to determine primarily, as a matter of fact and in law, on the oral and documentary evidence presented at the pre-trial hearing, the legal status of highways 77 and 192, within the Prado Flood Control Dam and Basin, as a result of the construction of Prado Dam, which was commenced in November of 1938, and was completed in April of 1941; and, corollarily, the interest of the State of California therein.

Hereinafter, for brevity, "Government" will refer to the United States, and "State" will refer to the State of California.

The Government contends that we are not dealing with State highways, but with county roads; that by deeds from the counties of San Bernardino and Riverside to the United States, both dated January 3, 1944 (Exs. 70 and 71 respectively), and judgments based thereon, stipulated to by the counties, and recorded in this court, the Government obtained fee and flowage easements, i. e., the right to flood and inundate intermittently below the elevation of 556 feet m. s. 1. (Mean sea level) the highways in question; while the State contends, on the other hand, that the said highways were not county roads, under the jurisdiction and control of the counties when the

said deeds were executed, but were State highways within the exclusive jurisdiction and control of the State, that it has not been compensated therefor, and that the Government is estopped to deny this fact by reason, inter alia, of agreements entered into between the Government and the counties of Riverside and San Bernardino, dated June 21, 1943, and July 6, 1943, respectively (marked exhibits M and N respectively), wherein and whereby the Government agreed to relocate these so-called State highways for the State of California.

In view of the fact that the State contends with much vehemence that it has been damaged to the extent of one million dollars, and extensive briefs have been filed, it is felt that this case merits considerable attention on the part of the Court; and, by reason of the fact that the Court concludes that these highways in question were not State highways under the jurisdiction and control of the State, but were county roads under the jurisdiction and control of the said counties, at the time of the execution of the said deeds to the Government on January 3, 1944 (Exs. 70 and 71), and that no estoppel can be raised against the Government to deny the State's contention that the roads were State highways, the ratio decidendi of this Court should be elaborated upon fully herein.

(2) *Statutory data—Act of June 22 1936:*

In limine, in order to develop a factual background leading to an orderly presentation of the Court's conclusions herein, it should be stated that the flood control of the Santa Ana River was made a Federal project by the Act of June 22, 1936, Public No. 738, 74th Congress, Title 33 U.S.C.A. § 701a et seq., which included, as one of its items, the following:

"Santa Ana River, California. Construction of reservoirs and related flood-control works for protection of metropolitan area in Orange County, California, in accordance with plans to be approved by the Chief of Engineers on recommendation of the Board of Engineers for Rivers and Harbors * * *." 49 Stat. 1589.

There was a declaration of policy that "destructive floods upon the rivers of the United States, upsetting orderly processes and causing loss of life and property, including the erosion of lands, and impairing and obstructing navigation, highways, railroads, and other channels of commerce between the States, constitute a menace to national welfare; that it is the sense of Congress that flood control on navigable waters or their tributaries is a proper activity of the Federal Government, in cooperation with States, their political subdivisions, and localities thereof; * * *." Title 33, Sec. 701a, U.S.C.A.

Under the plan as set forth in the 1936 Act, "After June 22, 1936, no money * * * shall be expended on the construction of any project until States, political subdivisions thereof, or other responsible local agencies have given assurances satisfactory to the Secretary of War that they will (a) provide *without cost to the United States* all lands, easements, and rights-of-way necessary for the construction of the project, except as otherwise provided herein; (b) hold and save the United States free from damages due to the construction works; (c) maintain and operate all the works after completion in accordance with regulations prescribed by the Secretary of War * * *." Title 33, Sec. 701c, U.S.C.A.

Certain exceptions were made, to wit, that if the dam site had been acquired and adequate assurances given respecting the acquisition of the easements and rights-of-way required for the reservoir area, the work of improvement could commence and continue concurrently with the acquisition of such rights; also, if the State consented thereto, and the Secretary of War approved, and it developed that the cost of the necessary lands, easements and rights-of-way exceeded the estimated cost, the Secretary of War was authorized to acquire such rights, etc. Under such plan, since the State or political subdivisions thereof, or other responsible local agencies, were to provide all of the necessary lands, easements and rights-of-way *free of cost to the United States,* and to hold and save it free from damages due to the construction of the improvement, it necessarily followed that it was not contemplated at that time that the United States

would be required to pay any sum for injuries which the State, counties, other political subdivisions or local agencies would suffer to their property rights. (Italics supplied.)

(3) *Statutory data—Act of June 28, 1938*: In 1938 the whole plan was changed by Congress, by the Act of June 28, 1938, Public No. 761, 75th Congress, Third Session, Chapter 795, Title 33 U.S.C.A. § 701a—1 et seq. Under Title 33, Section 701c—1, the United States was directed to acquire title to all lands, easements and rights-of-way for any dam and reservoir project authorized by the previous (1936) Act; and the provisions, which previously authorized and required the State, its political subdivisions and other responsible local agencies to acquire them, were expressly repealed.

Realizing that the States et al. had already commenced acquisitions, it was also provided:

"* * * States, political subdivisions thereof, or other responsible local agencies, shall be granted and reimbursed * * * sums equivalent to actual expenditures deemed reasonable by the Secretary of War and the Chief of Engineers and made by them in acquiring lands, easements, and rights-of-way for any dam and reservoir project, * * * provided, That no reimbursement shall be made for any indirect or speculative damages: Provided further, That lands, easements, and rights-of-way shall include lands on which dams, reservoirs * * * are located; lands or flowage rights in reservoirs and highway, railway, and utility relocation. * * *" Title 33 U.S.C.A. § 701c—1.

This, for the first time, authorized the United States *to pay for highways* and thus to pay compensation to States and their subsidiaries. (Italics supplied.)

(4) *The Orange County Flood Control District (sometimes referred to as the O.C.F.C.D.):*

The Orange County Flood Control District (a political subdivision of the State of California), organized and existing by virtue of the Orange County Flood Control Act (Chap. 723, p. 1325, Stats. of California 1927), in effect July 29, 1927, and as amended and supplemented, was engaged in the acquisition of lands, easements and rights-of-way for said Prado Dam and Flood Control Project prior to the enactment by Congress of the Flood Control Act of 1938, supra.

During the effective period of the 1936 Act of Congress, supra, the Orange County Flood Control District had acquired certain lands and interests therein for use by the Federal Government in the erection of the dam, including the area actually covered by the structure and various portions of the Basin area above the dam, *but not including any easements or rights-of-way for road purposes.* (Testimony of Hammond, Vol. V, page 584, line 5 to page 585, line 8 of Reporters' Transcript of Proceedings.)

Subsequent to the enactment of Title 33, U.S.C.A. § 701c—1, the 1938 Act supra, said District was reimbursed by the United States to the extent deemed reasonable by the Secretary of War and Chief of Engineers (Testimony of Hammond, Vol. V, page 584, lines 1–3; Sec. 1963, subd. 15 Cal. Code Civ.Proc.

(5) *Construction and description of Prado Dam:*

Prado Dam was commenced about November, 1938, and was completed in April, 1941. It is an earth-filled structure with a height of approximately 105 feet above the bed of the Santa Ana River. (Means, Vol. III, page 289, line 15, of Reporters' Transcript.) It has a length of approximately 2200 feet, a width of several hundred feet at the base, and of thirty feet at the crest. The elevation of the bed of the Santa Ana River at the dam site is approximately 460 feet above m. s. l. (Means Sea Level.) The top of the dam reaches a height of 556 feet above m. s. l., and it is served by a spillway which reaches a height of 543 feet. It is not a reservoir type or storage dam, but was created to be operated, and it is operated solely, as a flood control retarding dam. (Means, Vol. III, page 289, line 22; page 290, line 4, of the Reporters' Transcript.) The elevation of so-called State Highway 77 at its lowest point above the dam is approximately 470 feet. As this opinion deals primarily with points of

law, it is not deemed necessary to describe the dam further or the road elevations.

(6) *Synopsis of facts commencing with litigation in case Nos. 754 O'C, 886 O'C and 1051 O'C Civil:*

Following the mandate of the 1938 Act of Congress, supra, the United States, between January and July of 1940, commenced three condemnation proceedings (Nos. 754 O'C, 886 O'C and 1051 O'C Civil); and, by the complaints and amended complaints in these three actions, acquired fee and flowage easement rights covering the entire Prado Reservoir Basin (Exhibit 29) below elevation 556 feet m. s. l., *subject to existing easements for highway and road purposes* (Defendant's Opening Brief, p. 11); and excepting the rights of the State of California, if any. There was no order made for immediate possession, nor a declaration of taking, in any of these three cases involving streets, alleys, highways and/or roads within the Prado Flood Control Basin.

Subsequently, deeds were obtained by the Government from San Bernardino County and Riverside County (exhibits 70 and 71 respectively), both dated January 3, 1944; and two final judgments in those three actions, as consolidated, to wit, the final judgment against the County of Riverside, dated March 27, 1945, which was entered in Civil Order Book 31 at page 501 of this court; and the final judgment against the County of San Bernardino, dated January 14, 1944, which was entered in Civil Order Book 22 at page 737 of this court, as amended and modified by the final judgment dated May 4, 1945, entered in Civil Order Book 32, at page 473 of this court.

(7) *Deeds from San Bernardino County and Riverside County (exhibits 70 and 71 respectively); and judgments entered pursuant thereto:*

By the aforementioned deed from San Bernardino County to the United States (Ex. 70), the Government acquired on January 3, 1944, a *permanent* easement for floodage purposes over all streets in the County of San Bernardino, State of California, *located within the Prado Flood Control Basin,* below elevation 556 feet m. s. l., consisting of the right to flood and inundate any and all of such streets whenever and wherever the operation of the Prado Flood Control Dam and Basin required such flooding and inundation. Numerous streets were particularly described, including "That portion of State Highway No. 77, also known as Pomona-Rincon Road. * * *"[1]

In the judgment against the County of San Bernardino, provision is made for the vesting in the United States of a perpetual right and easement which is identical with that set forth in said deed. The final judgment recites that the County of San Bernardino is not entitled to be paid by the United States for the condemnation and taking by the Government of all of the rights therein specified, or as specified in the contract of July 6, 1943, between the Government and the County of San Bernardino (Ex. N), nor for the doing and performing by the County of San Bernardino of any of the things required to be performed by said county, under said contract; and mentions that the judgment is in substantiation of, and in conformity with, *but not in lieu of,* any of the provisions of the said contract. (Italics supplied.)

By the aforementioned deed from Riverside County (Exhibit 71), the United States, on the 3rd day of January, 1944, was likewise granted a permanent easement for floodage purposes over all streets in the County of Riverside, State of California, *located within the Prado Flood Control Basin,* below elevation 556 feet m. s. l. consisting of the right to flood and inundate any and all of such streets, whenever and wherever the operation of the Prado Flood Control Dam and Basin required such flooding and inundation. Numerous streets were particularly described including: "Existing State Highway

---

[1] While the deed (Ex. 70) does not mention Highway 192 as such, it is the understanding of the Court that the Government and the State both agree that the portion of Highway 192 within the Prado Flood Control Dam and Basin in the County of San Bernardino is covered by its legal description therein.

No. 77, also known as Pomona-Rincon Road. * * *"[2]

The final judgment against the County of Riverside awards $10,000 to the county of Riverside for all the rights of the county of Riverside to all streets and alleys located within that portion of Prado Flood Control Basin, as the same now exists within Riverside County, at or below the level of 556 feet m. s. l., and gives the United States the perpetual right and easement to flood and inundate any and all of said streets and alleys, etc.; and for the doing and performing by the County of Riverside of all things that are required to be done and performed by the said county under the provisions of the contract, dated June 21st, 1943, between the county of Riverside and the United States (Ex. M).

The Government contends that to the extent the county of San Bernardino could vest flowage easement rights in highways 77 and 192, within the Prado Flood Control Basin, by deed (Ex. 70), in the United States, and to the extent that the county of Riverside could vest flowage easement rights in highway 77, within the Prado Flood Control Basin, by deed, (Ex. 71), in the United States, and to the extent that judgments based thereon against the counties (supra) could vest such interests in the United States, *all of the roadway easements which are the subject of this proceeding had vested in the United States by the aforementioned deeds of January 3rd, 1944* (Exs. 70 and 71).

(8) *Government's amendment to complaints and amended complaints, filed December 20, 1945, in consolidated Action No. 754 O'C Civil:*

Subsequent to the delivery of said deeds (Exs. 70 and 71, supra), and the entry of said judgments (supra), representatives of the Department of Public Works, Division of Highways of the State of California (formerly the State Highway Commission) informed the Government that the State was claiming that it had the title to the *public roadway easements* which are described as Parcel A in the Government's amendment to complaints and amended complaints, filed December 20, 1945, in consolidated Action No. 754 O'C Civil, which is hereinafter referred to; *that such roadway easements were portions of the State Highway System; that the counties of Riverside and San Bernardino had no authority to divest the State of any interest therein,* and that the State, through the Department of Public Works, Division of Highways (formerly the State Highway Commission), demanded compensation therefor.

As a result thereof, the Government procured an order of this court on December 20, 1945, consolidating Actions Nos. 754 O'C, 886 O'C and 1051 O'C Civil to be hereinafter numbered and filed as Action No. 754 O'C Civil; and, on December 20, 1945, filed its amendment to the complaints and amended complaints in said three actions, as a consolidated action, seeking to acquire *for the first time:*

"A permanent easement in, over and upon any right, title and interest of the State of California in the roadways claimed by it to be State Highways 77 and 192 within the Prado Reservoir Basin below elevation 556, *which the Government did now already have,* which easement shall consist of the right to intermittently flood and inundate any and all portions thereof whenever and wherever the control of the storm water run-off in the Prado Flood Control Basin requires such flooding and inundation." (Government's Brief, page 11.)

In its pleadings, the Government specifically alleged that *it did not concede that the State of California has or had any such right, title or interest therein,* nor that there were or are secondary or other state highways, and also alleged the right of set-off of special benefits which are specifically set forth and described; and that such right of set-off of the special benefits is a mandatory requirement of the 1938 Flood Control Act through the adoption of Title 33 U.S.C.A. § 595, as a part of Title 33 U.S.C.A. § 701—2.

---

[2] No portion of highway 192 within the Prado Flood Control Dam and Basin is within the county of Riverside (defendant's opening brief p. 4) and hence would not be mentioned in the deed (Ex. 71).

(9) *Answer of the State of California, filed January 8, 1946, to amenedment to complaints and amended complaints in consolidated Action No. 754 O'C Civil:*

In reply thereto, the State of California, through its Department of Public Works, Division of Highways, has filed its answer, wherein it has raised the following issues, inter alia, in its first defense:

(A) That the easements and rights-of-way which were described under the heading "Parcel A" in plaintiff's amendment to complaints and amended complaints, and upon which plaintiff seeks to acquire the above described permanent flowage easements, are portions of State Highway Statutory Routes 77 and 192 within the Prado Flood Control Basin, that at all times they were owned directly by the people of the State of California and were under the jurisdiction, possession and control of the Department of Public Works; that said Route 77 constitutes an improved and established State Highway extending from Los Angeles, by way of Pomona and Temecula, to San Diego; that said Highway is arterial in character and serves the public generally, and is a portion of the Federal Aid System of highways in the State of California; that said Route 192 constitutes an improved and established State highway extending from said Route 77 via Euclid Avenue to Route 190 in Upland; that said highway is arterial in character and serves the public generally;

(B) That, by virtue of the construction and operation of Prado Dam, it is necessary that such highways and each of them be relocated and replaced and that equivalent substitute highways equal in utility to said highways thus taken and destroyed should be provided by the plaintiff to the State;

(C) That the reasonable cost and expense of providing highway facilities equal in utility to said State Highways, taken and destroyed by the plaintiff, or which will be taken and destroyed by the plaintiff, is not less than $950,000;

(D) That since the completion of the dam, the State has been required to expend upon said highways monies which it otherwise would not have been required to expend to the amount of not less than the sum of $50,000.

(Note: The second defense of the defendant, relied upon by the defendant in its answer, will be discussed under the subject of Estoppel, infra.)

(10) *Government's contention at the pre-trial hearing:*

The Government contended at the pretrial hearing that the principal issues, to which the others are subsidiary, are as follows:

(1) Does the State have any compensable interest not already satisfied? (Issues raised in defendant's first defense in its answer.)

(2) Is the United States estopped to deny that the State has such interest? (Issues raised in defendant's second defense in its answer.)

(3) What is the measure of damages to be applied, if the Court finds that the State has a compensable interest for which it is entitled to damages?; and

(4) Is the United States entitled to. set-off against such compensation special benefits which the State has derived through the erection and operation of Prado Dam?

(11) *Defendant's construction of the issues raised at the pre-trial hearing:*

The defendant contends that the issues involved, as a result of the pre-trial hearing, are:

(1) Should the *State* highways in question, in view of all the facts and circumstances, particularly the affirmative rights thereover sought to be acquired by the United States, be relocated from within Prado Basin?

(2) If there are substantial reasons supporting such relocation, what is the measure of the compensation to which the State is entitled? [3]

(3) Are the contracts entered into between the Government and the counties

---

[3] According to witness Grumm, approximately six and one-half miles of *State* highway No. 77 within the Prado Retarding Basin are below the 556 foot elevation contour and are subject to floodage or inundation, and should be relocated immediately to the west and along the edge of the reservoir site,

(Exs. M and N) binding on the Government? and

(4) If necessity exists for relocation of the highways, are there any direct or special benefits (within established rules as to such benefits) to which the plaintiff is entitled as an offset?

(12) *Facts not in issue at the pre-trial hearing, and which are not decided by the Court:*

Parenthetically, in view of the narrow issue upon which the decision of this Court turns, it is important to keep in mind that, at the pre-trial hearing, there was no issue raised as to the *power* of the Legislature of the State of California to convert these roads into *State* highways, for that power was specifically vested by the California Constitution, Article IV, Section 36, and probably existed without such grant[4]; there was no issue raised as to the *power* of the Department of Public Works, Division of Highways (or its predecessor, the State Highway Commission), to take over these roads as *State* highways; or to acquire, lay-out, construct, improve or maintain them as *State* highways. Stats.1931, p. 102, Chapter 82; Streets and Highways Code of California, Sections 24, 100, 377 and 492.

There was no issue as to the *power* of the State Highway Commission to take them without the consent of the counties, and without paying compensation therefor to the counties. Watson v. Greely, 67 Cal. App. 328, 338, 227 P. 664; City of Los Angeles v. City of Southgate, 108 Cal.App. 398, 404, 291 P. 654; San Francisco-Oakland Terminal Railways v. County of Alameda, 66 Cal.App. 77, 81, 225 P. 304.

"The property of which a * * * county has acquired * * * ownership as an agency of the State and which it holds strictly for public uses, is subject to legislative control. Such property may be transferred to some other agency of the Government charged with the same duties * * * without the consent of the (county) and without compensation." 18 Am. Jur. 805.

█ As contended for by the Government, the Court is of the opinion that there is no *power* in this Court to decide where the Department of Public Works, Division of Highways (formerly the State Highway Commission), may locate any State highway, nor the type or character thereof, such determination being exclusively vested in the Legislature and in its delegate, to the extent that it has made a lawful delegation; and the Government is not concerned therewith, and no such issue exists herein. People v. Olsen, 109 Cal.App. 523, 530, 293 P. 645.

█ The Court is further of the opinion that the Government's position is correct that the *sole* issue, in deciding whether or not, as a matter of fact and in law, Highways 77 and 192, within the Prado Flood Control Basin, are actually State highways, is not what the Legislature of the State of California, acting through its delegate at that time, the State Highway Commission, could have done, *but what it actually did,* and what is the legal result thereof.

(13) *Court's interpretation of the issues raised at the pre-trial hearing requiring adjudication:*

The crux of this decision hinges upon whether or not Highways 77 and 192, within the Prado Flood Control Basin, were actually State highways, in fact and in law, when the deeds were given by the counties of San Bernardino and Riverside to the United States on January 3, 1944 (Exs. 70 and 71 respectively), which · Highway 77, by way of interpolation, was actually denominated a *State* highway therein.

The Court will paraphrase quære No. 1 of the Government, "Does the State have

---

along the edge of the 556 foot contour on the higher ground above that elevation (Vol. I, p. 112 of Reporters' transcript).

4 The Legislature (of California) has the power to take over exclusive control of the construction and maintenance of public highways, whether they be through or main highways or socalled county roads, and this power has always resided in the state through its Legislature irrespective of the adoption of Section 36 of Article IV of the Constitution (Watson v. Greely, 67 Cal.App. 328, 338, 227 P. 664 (decided 1924)).

any compensable interest not already satisfied?" (supra) as follows:

"Quære: Were Highways 77 and 192, within the Prado Flood Control Basin (A) described with sufficient particularity, within the statutory provisions, to become *State* highways; and (B) Were Highways 77 and 192, within the Prado Flood Control Basin, *State* highways, as a matter of law and in fact, on January 3rd, 1944, when the deeds were given by the Counties of San Bernardino (Ex. 70) and Riverside (Ex. 71) to the United States?"
And quære No. 2 of the Government, "Is the United States estopped to deny that the State has such interest?" will be discussed under the subject of estoppel.

The decision on these two quæries, and on defendant's quære No. 3, will render moot the necessity for a discussion of the Government's remaining contentions Nos. 3 and 4, as well as on the remaining issues raised by the defendant.

(14) *Quære: Were Highways 77 and 192, within the Prado Flood Control Basin, described with sufficient particularity, within the statutory provisions, to become State highways?*

The paramount question to be decided by the Court, as a result of the pre-trial hearing, is whether or not Highways 77 and 192, within the Prado Flood Control Basin, were in fact and as a matter of law, actually *State* highways at the time of the execution of the deeds by the counties of San Bernardino and Riverside (Exs. 70 and 71 respectively) to the United States on January 3d, 1944, for obviously if these two highways were not actually *state* highways at that time, the deeds by these two counties, and the final stipulated judgments against the counties pursuant thereto, vested all rights sought by the United States in these two highways, within the Prado Flood Control Basin, in the Government; and the State of California does not have any compensable interest therein, in which

event the defendant fails in its first defense in its answer; but the first quære "Were Highways 77 and 192, within the Prado Flood Control Basin, described with sufficient particularity, within the statutory provisions, to become *State* highways" will be answered first.

"The power of the Legislature was and is plenary and complete. To the extent that it exercised such *power*, with reference to these roads, it did the following:

"(a) It generally defined the course of the mandatory *State* highways 77 and 192, as follows:

"Route 77 (so far as it is applicable to the roads within the Prado Flood Control Basin) is described in S. & H. Code (of California.) Section 377 as: '(b) Pomona to San Diego via Temecula.'[5] Apparently, the Legislature purposely declined to adopt the recommendations of the (State) Highway Commission (Exhibit D and map attached) and purposely left the alignment or course, *general,* for it did not incorporate the more detailed description of Route M which was set forth in such recommendation and which read (Exhibit D, page 34)—'It would use the present Santa Fe overhead, follow along the northeast edge of the Puente Hills, cross the Santa Ana River and the Santa Ana Canyon Road near Prado and Corona.' Nor did the Legislature specify the *relocation* of the existing county road which is indicated by the map of Route M attached to Exhibit D, reference to which discloses that the 'recommended state highway' is illustrated by heavy broken black lines which do not follow Pomona-Rincon Road or Pioneer Road but, instead, follow a straighter and more direct course to Pomona departing in a number of places from the existing county road.

"Route 192 (so far as it applies to the Prado Flood Control Basin) is even more indefinite. S. & H. Code, Section 492, reads:

---

[5] Defendant states that "Route 77 was added to the State highway system of California by Chapter 82, Statutes of 1931" and "consists of a through state highway from Pomona to San Diego via Temecula and includes that portion of Route (1) included in Chapter 82, extending from Temecula to San Diego, and all of route (m) extending from Pomona to Temecula." (Defendant's Opening Brief, p. 3).

" 'Route 192 is from Route 77 via Euclid Avenue to Route 190 in Upland.' "[6] (Government's brief, pp. 29, 30.)

The Government contends that "references to Exhibits 2 and 29 show that there is not now, and was not in 1933, which was the date of the alleged taking by the State (Ex. H), any point or place where *state* Highway 77 touched Euclid Avenue; hence we have in our definition a delegation of power which begins with a non-existent point or status," and that " 'From Route 77 via Euclid Avenue' is so ambiguous and unintelligible as to be completely nugatory and void," and "Even if we assume that, in 1933, *State* highway 77 ran along Central Avenue to Pine, thence along Pine to Pioneer and down Pioneer to Pomona-Rincon Road (which the State claims to be the legal effect of Exhibits E and F), there were at least nine county roads located substantially parallel to and north of Pine Avenue connecting Central Avenue with Euclid Avenue, any of which and all of which would conform to the above legislative definition, to wit, (reading from north to south): Walnut Street, Riverside Avenue, Chino Avenue, Shaefer Avenue, Edison Avenue, Eucalyptus Avenue, Kimball Street, Schleisman Street and Pine Avenue. All of these were and are traversable and equally direct from Central to Euclid Avenue and would, therefore, meet the requirements of Section 100, S. & H. Code, infra. It is extremely doubtful whether the Legislature could make so fanciful, ambiguous and unintelligible delegation of its powers." (Government's Brief, p. 30.)

The Government concedes that it has found no express California decision upon this particular point, but cites the following authorities to the effect that "A road cannot be regarded as established until it has a definite location." (39 C.J.S., Highways, § 63); Barnes v. Fox, 61 Iowa 18, 15 N.W. 581. "It is not sufficient to recommend that a road be located but the *point of starting* must be actually found and the road actually located." 29 Cor.Jur. p. 456. "To lay out a highway is to locate it and define its limits." Crawford v. City of Bridgeport, 92 Conn. 431, 103 A. 125, 126: "If the direction of a street as laid out and recorded is uncertain, the laying out is void." Hinckley v. Hastings 2 Pick., Mass. 162.

The State, on the contrary, contends that neither Section 75 of the Streets and Highways Code authorizing the California Highway Commission to "select, adopt, and determine the location for State highways on routes authorized by law," nor Section 100, which provides, in part that "The department (of Public Works) shall maintain any existing traversable highway which is between the termini of, and approximately on, any route included in the State highway system" expresses any particular method or procedure for exercising these powers, and that it has been done for many years by resolution.

With respect to the Government's alleged indefiniteness of these two routes as set out in the S. & H. Code, supra; and its contention that the legislative designations of the State highway routes herein in question are so ambiguous and unintelligible as to be completely nugatory and void, the State of California sets out the Statutory History of the Highway system in California, from which it is noted that not a single State highway route was specifically designated.[7]

---

6 Defendant states that "Route 192 was added to the State Highway system by Sec. 7 of Chapter 767, p. 2034, Stats. of 1933, wherein it was described (p. 2041) as extending from 'State highway route 77 via Euclid Avenue to Highland Avenue in Upland.'" (Defendant's Opening Brief, p. 3).

7 "Statutory history of the highway system. Construction of a system of State highways in California was initiated by the State Highways Act of March 22, 1909, Stat. 1909, Chap. 383,

p. 647, sometimes referred to as the $18,000,000 bond issue.

"The Act provides, in part, as follows (Sec. 4):

" 'The moneys placed in the state highway fund, pursuant to the provisions of this section, shall be used exclusively for the acquisition of rights of way for and the acquisition and construction of said system of state highways. *The route or routes of said state highways shall be selected by the department of engineering* and said route shall be so.

"The first State Highways Act was followed by the 'State Highways Act of 1915,' approved May 20th, 1915, Stat. 1915, Chap. 404, page 650 (sometimes referred to as the $15,000,000 bond issue). This Act (Sec. 4) added a number of routes to the system established under the original Act, all of which are described in the most general language. Detailed locations of these routes were to be *selected* by the department of engineering in the manner provided by the original act.

"The 1915 Act further provided (Sec. 8) that, with certain exceptions, not pertinent here, *all public highways* within the State lying *within the right-of-way of the State highway* as determined and adopted by the department of engineering, *were to become a part of the right of way of said State highway* without compensation being paid thereof.

"The 1915 legislation was followed by the socalled $19,000,000 bond issue which was submitted in the form of a constitutional amendment (Article XVI, Sec. 2, Constitution of California). This amendment also added a number of routes to the State highway system by designation of termini in general language.

"Provisions of the two prior State Highways Acts relating to the selection of routes, character of construction of highways, manner of conducting work thereon, the powers and duties of officers in connection therewith, *adoption of public highways as State highways,* were adopted as applicable to all highways to be constructed with the funds provided by the amendment." (State's Reply Brief, pp. 19 and 20.)

Section 4 of the Act of March 22d, 1909, supra, specifically vests in the Department of Engineering the jurisdiction to select the route or routes of State highways; and, as no case has been presented to the court construing Sec. 4 of the Statute of 1909, Chap. 383, p. 647, for indefiniteness, the Court concludes that S. & H. Code, Sec. 377, defining Route 77, and S. & H. Code, Sec. 492, defining Route 192, are sufficiently definite to meet the requirements of the law.

(15) *Quaere: Were Highways 77 and 192, within the Prado Flood Control Basin, State highways, as a matter of law and in fact, on January 3, 1944, when the deeds were given by the counties of San Bernardino (Ex. 70) and Riverside (Ex. 71) to the United States?*

It is the Government's further contention, in the event that the Court held that the routes of highways 77 and 192 were sufficiently definite to have become *State* highways (which is the ruling of this Court so far as descriptive definiteness is concerned) that the State Highway Commission (now the Department of Public Works, Division of Highways) did not take them over for maintenance as *State highways,* and, particularly, did not acquire, lay-out, construct or improve them as *State highways, but merely contracted with the counties of San Bernardino and Riverside to maintain them as traversable or travelable county roads until it should make its decision whether to adopt them or any por-*

---

selected and said highways so laid out and constructed or acquired as to constitute a continuous and connected state highway system running north and south through the state traversing the Sacramento and San Joaquin valleys and along the Pacific coast by the most direct and practicable routes, connecting the county seats of the several counties through which it passes and joining the centers of population, together with such branch roads as may be necessary to connect therewith the several county seats lying east and west of such state highway.'

"It is to be noted that *not a single State highway route was specifically designated.*

"The Act further provided: (Sec. 8) "' * * * all *public highways* within this state lying within the right of way of said state highway *as determined and adopted by the department of engineering* shall be and the same *shall become a part of the right of way of said state highway,* without compensation being paid therefor; provided nothing herein contained shall require the State to maintain any highway along or on said right of way, prior to the completion or acquisition of the *permanent improvements* contemplated by this act * * *.'" (Italics supplied.) (Defendant's reply brief pp. 18, 19).

*tion of them as a portion of the State Highway System,* and exacted of each county the right to return them and discontinue State maintenance as traversable roads, if the State Highway Commission ultimately decided not to so incorporate them in the State Highway System which, as the Government contends, was an alternate power vested in the said State Highway Commission under Sec. 100 of the S. & H. Code, infra.

The Government contends with considerable insistence that the documents executed between the State Highway Commission and the counties of San Bernardino and Riverside (Exs. E, F and H) disclose that it was the deliberate intent of the contracting parties *that the roads were not to be taken over as State highways, but were to be merely temporarily maintained as county roads pending a further determination as to whether they were to be incorporated in the State Highway System.*

 There would seem to be little doubt about there being at least two systems of highways or roads in California, State highways, under the control of the State, through the Department of Public Works, Division of Highways (formerly the State Highway Commission); and county roads, under the control and jurisdiction of the counties through their respective Boards of Supervisors.[8]

Referring to Exhibit E, containing the agreement entered into between the Board of Supervisors representing San Bernardino County, and the California Highway Commission, relative to alleged *State* Highway 77 in San Bernardino County, it is to be noted that in the resolution of the Commission, dated July 30, 1931, this express and deliberate language is used:

"Voted, that * * * those county roads * * * shown in red * * *

be taken over for maintenance * * * in accordance with letter and resolution to board of supervisors. * * *"

It is noted particularly that the resolution does not state "for maintenance *as State highways,*" but in accordance with the letter to the board.

In Exhibit E (letter to Board of Supervisors of San Bernardino County from the State Highway Commission, dated June 10, 1931) we find on page 3:

"Maintenance of the whole or any part of the above described county roads not included in the final *location or adopted layout, will be discontinued when the state highway is laid out, adopted and constructed.*"

Such language could only mean that the inclusion of such roads in the State Highway System had not then been determined, and was to be determined upon in the future. In Exhibit E, in the resolution passed by the Board of Supervisors of San Bernardino County, dated August 10, 1931, we find: (page 1):

"Whereas, * * * the California Highway Commission * * * will * * * extend state maintenance to the most practical and direct traversable county road between the designated termini. The following county roads will be maintained * * * *until such time as a state highway is laid out,* adopted and constructed between said termini, and

"Whereas, the California Highway Commission has requested this Board of Supervisors to approve of the action of said Commission *and to agree to resume control over such portions of said county roads not included in the final location of the said state highway when laid out, adopted and* constructed.

"Therefore, be it resolved that the county of San Bernardino * * * does here-

---

[8] Sec. 24 of the S. & H. Code: State Highway: "As used in this code, 'State highway' means any highway which is acquired, laid out, constructed, improved or maintained *as a State highway* pursuant to constitutional or legislative authorization," Enacted 1935, based on former Pol.Code, § 363r;

Sec. 25 of the S. & H. Code: County Highway: "As used in this code, 'county

highway' means any highway which is: (a) Laid out or constructed as such by the county. (b) Laid out or constructed by others and dedicated or abandoned to or acquired by the county. (c) Made a county highway in any action for the partition of real property. (d) Made a county highway pursuant to law." Enacted 1935, based on former Pol.Code, § 2618. (Italics supplied.)

by consent to the \* \* \* *commission taking control of the maintaining the above described county roads* and does further agree that the \* \* \* commission may relinquish to this county, and this county, will resume full control and responsibility for, such portions of the aforesaid county roads *as shall not be* included within the layout of said State highway as finally laid out, adopted and constructed." [9] (Italics supplied.)

Referring to Exhibit F, containing the agreement entered into between the Board of Supervisors representing Riverside County, and the California Highway Commission, in connection with alleged *State Highway 77* in Riverside County, a reference to the resolution of the said State Highway Commission, which is a part of Exhibit F, discloses that the identical language is used as that quoted from the resolution which is a part of Exhibit E.

A reference to the letter from the State Highway Commission to the Board of Supervisors of Riverside County, dated June 9, 1931, which is a part of Exhibit F, discloses that the identical language is used as that which is above quoted from the letter to the Board of Supervisors of San Bernardino County, which is a part of Exhibit E; and a reference to the resolution of the Board of Supervisors of Riverside County, which is a part of Exhibit F, discloses that it uses this language:

"Whereas, the California Highway Commission has requested this Board of Supervisors to approve of the action of the said Commission and to *agree to resume control over such portions of said county roads not included in the final location of the said state highway when laid out, adopted and constructed. Therefore, be it resolved, that the County of Riverside* \* \* \* *does* hereby consent to the \* \* \* commission taking control of *and maintaining the above described county roads,* and does further agree that the \* \* \* commission may relinquish to this county, and this county will resume full control and responsibility for such portions of the aforesaid county road *as shall not be included within the layout of said state highway as finally laid out, adopted and constructed."* (Italics supplied.)

A reference to the resolution, which is a part of Exhibit H, relative to alleged *State* highway 192, shows that it uses this language:

"Voted, that, \* \* \* those county roads \* \* \* be taken over for maintenance \* \* \* in accordance with letter and **resolution** to Boards of Supervisors."

A reference to the letter to the Board of Supervisors of San Bernardino County from the State Highway Commission, dated August 16, 1933 (Exhibit H), discloses that the following language is used:

" \* \* \* the California Highway Commission has provided for the taking over by the Department for maintenance of certain travelable county roads \* \* \* the Department \* \* \* proposes to maintain such roads until such time as the state highway is finally located, constructed, and opened to travel between the termini as set forth in the statute. When such construction is undertaken on the final location, it may not coincide with or occupy in its entirety the traversable roads now proposed to be taken over for maintenance. *When the finally constructed road is open-*

---

[9] According to defendant "There was, however, in 1931, a reason for the procedure then adopted, (Route 77), particularly the request addressed to the counties that they agree to a relinquishment back to them of the highway in question should the Commission, in the future, determine to relocate this State highway or a portion thereof. The reason was this: at that time (1931), Section 365d of the Political Code, as amended by Statutes of 1931, chapter 170, p. 245, provided that the California Highway Commission was 'empowered to relinquish to any county \* \* \* any portion of any state road or highway within said county \* \* \*, with the consent of the board of supervisors of such county \* \* \* and thereupon the title to said portion of said road or highway so relinquished shall revert to said county \* \* \* as a county road \* \* \*.' A similar provision was contained in the Act of May 20, 1915. Stat. 1915, Chap. 398, p. 640. These provisions of law (requirement for consent of the board of supervisors to relinquishments) have subsequently been repealed." (Defendant's reply brief pp. 29–30).

ed to travel it will be necessary to relinguish to the county of San Bernardino such portions of the roads then being maintained as may not be included in the final state highway location. It is desirable that such action have the approval of the county, and it is requested, therefore, that your board adopt the resolution enclosed herewith."

And, in the resolution of the Board of Supervisors of San Bernardino County, dated September 5, 1933, which is a part of Exhibit H, we find:

"Whereas, * * * the Department of Public Works proposes * * * to take over for *maintenance* the following described county roads * * * which said roads are existing travelable roads * * * and Whereas, said Department * * * proposes to continue maintenance of said roads until such time as the State highways are constructed and open to travel * * * and

"Whereas, the * * * Commission (has) requested the county * * * to assent to (its action) * * * in proposing to take over for maintenance said county roads and to agree to resume jurisdiction over and responsibility for construction and maintenance thereof, or portions thereof, *as may not be included in the state highways,* when the same are laid out, adopted, and constructed between said termini; therefore, Be it Resolved, by the * * * County * * * that said county assent to, and it does hereby assent to, the taking over for maintenance by said Department of the hereinbefore described travelable county roads; that upon the relinquishment of said roads, or any portion thereof, to the county * * * *said county agree (s) and it does hereby agree, to resume jurisdiction over and responsibility for construction and maintenance of*

*said roads, or portions thereof, so relinquished."* (Italics supplied.)

■ Unquestionably, if the State had been taking over highways 77 and 192 as *State* highways it would have categorically said so without the slightest equivocation. The Court agrees with the contention of the Government that no clearer language could have been used to indicate that the State Highway Commission had not yet located, constructed or adopted the course of the state highway provided for by the Legislature, and that the taking over of the roads was not for the purpose of converting them immediately from their status of county roads to the new status of *State* highways.

The Government contends that "when we consider that adoption into the State Highway System would have meant permanent liability for maintenance, which, as we have seen, would be a considerable burden, since the relatively short sections of roads which are involved in this trial cost the State $140,000 in maintenance between 1931 and 1940 (no improvements having been made since the Prado Dam was erected) Grumm, Vol. I of Reporters' Transcript p. 118, lines 8-11) we can readily understand why the Highway Commission was so insistent that the agreements (Exs. E, F and H) be clear that the county roads would remain such and could be relinquished to the counties, if the Commission did not decide to include them in the State Highway System." (Government's Brief, p. 35.) [10]

■ Bearing in mind that we are dealing with the status of those portions of highways 77 and 192 in 1931 and 1933, which subsequently were found to be within the Prado Flood Control Basin, to determine whether, under the law and also in the minds of the State Highway officials

---

[10] Section 73 of the S. & H. Code provides that the California Highway Commission may "relinquish to any county * * * any portion of any State highway within such county * * * which has been superseded *by relocation, for use as a county highway * * *."*
If State highways, the State alone would have the obligation for maintenance (S. & H. Code, Secs. 100 and 182); if a county road, the obligation would be exclusively that of the county (S. & H. Code, Sec. 964); if a state highway, the only authority to abandon and vacate would be in the State, (S. & H. Code, Secs. 835, 836); Whereas if they be determined to be county roads, such exclusive authority is vested in the County, (S. & H. Code, Sec. 901). (From Government's brief p. 57.).

and the Board of Supervisors of each of these two counties (although intent cannot change the law), highways 77 and 192, within the county of San Bernardino, and highway 77, within the county of Riverside, were actually *State* highways or county roads at that time, the legislation then in force in California has been presented to the Court with the contentions of counsel for the State [11]; but the Court can see

[11] "The change in policy respecting maintenance: In 1925, the policy of non-maintenance of sections of State Highway not permanently constructed or improved, (as provided in the 1909 Act, Sec. 8) was reversed by enactment of Section 365d of the Political Code (Stat. 1925, Chap. 234, p. 380) which provided, in part, that 'Said California Highway Commission is hereby directed to maintain all *traversable roads* which now are or that may be hereafter *included in* the state highway system.'

"The change in policy respecting maintenance of traversable State highways had its inception in recommendations made by the California Highway Commission in the Biennial Report to the Governor, dated November 1, 1924, from which the following is quoted (p. 23):

"'* * * the Commission is of the opinion that when funds are available, it would be desirable to assume upon behalf of the state the following activities:

"'1. Maintenance of *travelable state highway routes* whether or not construction has been commenced or completed; * * *'

"The Commission stated its reasons for this recommendations as follows (p. 23):

"'The Commission believes the activities outlined above to be proper functions of the State Highway Department. They outlined steps which must be taken to provide the safeguards and service which the users of the highways are entitled to expect. This will be especially true if highway users are to assume a larger share of highway costs than they now pay.

"'1. Increasing traffic demands that *traveled state highway routes* be maintained. Counties are frequently unable, financially, to do the work on *designated* state highways, and the general public suffers. It is evident that the time has come when the state should assume the additional cost of maintaining these *unconstructed sections* until such time as their actual building can be undertaken. On roads of light traffic, improvement under maintenance may make construction unnecessary for many years.'

"Respecting the results of the adoption of the new policy; the Highway Commission in its Biennial Report to the Governor, dated November 1, 1926, said (page 17):

"'Most satisfactory progress has been made in maintenance. Under authority of the law enacted by the 1925 legislature and signed by the Governor, the Commission was enabled to take over for maintenance approximately 1200 additional miles of roads *legally in the system but never having had state service.* A year's program of this additional service has resulted in a very marked improvement in the *traversable* condition of these roads and has very considerably curtailed the pressure on the Commission for more costly improvements.'

"And in the report of the State Highway Engineer to the Commission, forming a part of the Report of 1926, Appendix 'A', he said (p. 23):

"'An event of major importance was the enactment by the 1925 legislature of a measure sponsored by the Highway Commission, which clarified many situations of legal ambiguity in previous measures concerning the state highway work. * * *

"'Probably the most important feature of this act is the one under which the Highway Commission is directed to undertake maintenance on all *traversable state* highways, whether constructed or unconstructed.'

"The reports from which we have quoted are provided for by law. They are official records of an executive department of the Government of California (Government Code, Sec. 14103.)

"This Court may take judicial knowledge thereof. 22 Cal.Jur. 633; Cal. Code Civ.Proc. § 1875(3); 10 Cal.Jur. 699.

"The quotations from the Biennial Reports indicate clearly the interpretation placed upon the 1925 legislation respecting maintenance of traversable highways by the highway department of the State, the agency concerned. *It considered them to be State Highways and acted accordingly.*

"2. Additional legislative enactments respecting funds. In 1927, the Legislature enacted Statutes of 1927, Chapter 794, page 1562, providing, among other things, for expenditure of funds for construction and maintenance purposes. This Act, in Section 5, authorized and directed the California Highway Commission to expend funds 'for maintain-

nothing in the California statutes, supra, which subsequently rendered the agreements between the counties of San Bernardino and Riverside with the State Highway Commission as the delegate of the State, now the Department of Public

ing or repairing to standard *all traversable state highways.'*

."*In 1931, State Highway Route 77 was added to the State Highway system* (Stat. 1931, Chap. 82, page 102). This chapter also added a number of other secondary highways to the State system, all of which were described generally without detailed specification of their location or termini. The Department of Public Works was authorized and directed to lay out and construct such highways on the most direct and practicable routes.

"3. *Legislative recognition of the departmental interpretation.*

"In 1933, the Legislature concurred, without reservation, in the interpretation that had been placed upon the *maintenance* statute by the Department of Public Works. It adopted Senate Concurrent Resolution No. 7 relative to the 'addition of new roads to the State highway system' and directing the Department of Public Works and the California Highway Commission to make and submit to the Legislature, on or before March 15, 1933, a report and recommendations with supporting engineering data for the inclusion of approximately 6600 miles *in the secondary State Highway System.* (Stat.1933, p. 2952.)

"This resolution read in part, as follows:

" 'Whereas, It may appear desirable during the fiftieth session of the Legislature *to add to the secondary State highway system* a substantial mileage of county highways and through routes in cities in order to afford a wider spread of State highway revenues and to afford substantial relief to counties and cities with respect to the maintenance and improvement of major county roads and through routes in cities, thereby permitting a reduction in local taxes for said purposes;. now, therefore, be it *Resolved* by the Senate, the Assembly concurring, That in order that proper consideration be given to the principle heretofore declared by the California Legislature respecting *additions to the State highway system* the California Highway Commission and the Department of Public Works be and they are hereby directed immediately to make the necessary studies and on or before March 15, 1933, to submit a report and recommendations with all supporting engineering data of all roads studied to this Legislature for the inclusion of. approximately 6600 miles *in the secondary State highway system*

and in addition thereto a similar alternative report for the inclusion of any lesser number of miles in the secondary State highway system and that in the selection of the routes and mileage to be added said California Highway Commission and the Department of Public Works shall be guided by the following basic principles: * * *

" '(3) That in the selection of county roads to be included, the California Highway Commission and the State Department of Public Works give consideration to those routes which are carrying or will serve a considerable volume of county or intercounty traffic and be connected with the present State highway system, *the inclusion of which in the State system* will afford a substantial measure of relief to the counties, and that in the selection of routes consideration be given to the needs of all parts of the State.'

"At the time of the adoption of this resolution, Section 365d of the Political Code directing the California Highway Commission to 'maintain all traversable roads which now are or that may be hereafter included in the state highway system' had been in effect for eight years and the department had acted under it in the manner hereinbefore indicated.

"The Legislature, following the report of the department, enacted Chapter 767 of the Statutes of 1933 (page 2029) which, by Section 7, added some 6600 miles of new routes to the State highway system (*including Route 192,* here under consideration) which were 'classified as secondary State highways.' The Department of Public Works was authorized and directed to maintain these new highways 'subject to the provisions of this act * * *'

"Section 2 authorized expenditures from the State Highway Fund 'for maintenance of *all State Highways, including all traversable highways* on authorized State highway routes.'

"The same session of the Legislature also adopted Chapter 326 (Stat.1933, p. 898) which, among other things, enacted 363r of the Political Code. This new section contained a direction to the department 'to maintain all traversable roads which now are or that may be hereafter included in the State highway system.' The former Section 365d was repealed.

"In the Biennial Report of the Division of Highways of the Department of Public Works to the Director of Public

Works, Division of Highways (Exs. E, F and H), of no force and effect; and which, *ex proprio vigore,* caused a transmutation of these county roads into *State* highways, or which would prevent the counties and the State from entering into agreements with each other that a county road should remain so; in fact, county roads are still recognized in California under Section 25 of the S. & H. Code, supra.

About the only evidence that the defendant presented at the pre-trial hearing to substantiate its contention that Highways 77 and 192, within the Prado Flood Control Basin, were *State* highways at the time of the execution of the deeds, dated January 3, 1944 (Exs. 70 and 71), in the Court's opinion, was that it assumed them to be so during these intervening periods.

(16) *Jurisdiction of the State Highway Commission, now the Department of Public Works, Division of Highways, and of the counties to enter into contracts inter se and with third parties:*

"By the terms of Political Code, Sec. 363h, as amended in 1927 (now Secs. 102 and 103 of the S. & H. Code), the Legislature has delegated to the highway commission, which thereby becomes a quasi judicial body for that purpose, the exclusive authority to determine (1) the public necessity for a designated highway, (2) that particularly described property is necessary therefor, and (3) that the proposed improvement is planned and located in a manner which is most compatible with the greatest public good and the least private injury. [And where] these matters have been judicially determined by the commission in the manner provided by law, *a resolution to that effect becomes conclusive evidence* which, in the absence of fraud, bad faith, or an abuse of discretion, may not be disputed." People v. Olsen 109 Cal.App. 523, 293 P. 645, 648. Also, *"When the state highway commission* * * * *adopts a resolution* * * * *that resolution becomes conclusive of such facts recited therein,* and the same may not be disputed in the absence of fraud, bad faith, or an abuse of discretion. Sec. 103 Streets and Highway Code" and cases cited. People v. Milton, 1939, 35 Cal.App.2d 549, 552, 196 P.2d 159, 160.

There was no contention made on the part of the State, and no evidence introduced, that the resolutions of the State Highway Commission in Exs. E, F and H, taking over the county roads for maintenance, were adopted by reason of fraud, bad faith or an abuse of discretion; but they were passed in the highest of good faith on the part of the State Highway Commission after much deliberation, and in the exercise of a sound discretion which was delegated to it by the Legislature. By a parity of reasoning, this Court can conceive of no reason why the said resolutions of the State Highway Commission in Exhibits E, F and H should not be *conclusive evidence* that highways 77 and 192, within the Prado Flood Control Basin, were to remain county roads or county highways until there was another statutory resolution of the State Highway Commission or its successor, the Department of Public Works, Division of Highways, of equal validity and executed with the same solemnity and formality, changing their status to *State* highways.

This Court does not doubt for one moment that the State Highway Commission and its successor, the Department of Public Works, Division of Highways, assumed over a period of years that these highways 77 and 192 were actually *State* highways and treated them as such, while these resolutions of the State Highway Commission (parts of Exs. E, F and H) fixing their status as county roads, remained in the archives of the State Highway Commission and probably forgotten. There was

---

Works, dated November 1, 1934, the State Highway Engineer makes the following statement (p. 15):

"'Legislation of importance to the continued development of a unified State highway system was enacted by the 1933 session of the State Legislature.

"'Possibly the most far-reaching enactment provided for *including within the State secondary highway system* approximately 6800 miles of county roads, thereby increasing the mileage in the system from about 7300 miles to approximately 14,000 miles.'" (Italics supplied.) (Defendant's reply brief pp. 20–26.)

798

no evidence introduced at the pre-trial hearing of any superseding resolution being passed by the State Highway Commission (now the Department of Public Works, Division of Highways) abrogating the agreements (Exs. E, F and H) or the resolutions therein, and denominating these two highways, within the Prado Flood Control Basin, as *State* highways; and, therefore, the said resolutions must be conclusively presumed to be still in full force and effect.

While neither side has made an issue of the power and jurisdiction of the counties to enter into contracts and agreements with the State, inter se, this Court assumes that, notwithstanding the fact that counties in California are classified as "legal subdivisions of this State" (Cal. Const. Art. XI, Sec. 1); are mere political subdivisions of the state with limited powers, and are in fact agents of the State,[12] that agreements between the counties, as agents of the State, and the State, as principal, are recognized as reflecting the intent of the parties when dealing with

each other in matters within the constitutionally limited delegated powers of the counties. At least the counties of San Bernardino and Riverside and the State considered their agreements were of some force and effect when the agreements (Exs. E, F and H) were negotiated; and it is upon these agreements and the resolutions therein that this Court primarily predicates its conclusion that Highways 77 and 192 were not actually State highways, in fact and in law, on January 3, 1944, when the deed from the county of San Bernardino (Ex. 70), and the deed from the county of Riverside (Ex. 71), were given to the government.

(17) *Construction placed upon Sec. 100 of the S. & H. Code by the Court:*

Under the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, a Federal district court is bound by the construction of a state statute by the highest court of that state, but, in view of the fact that Sec. 100 of the S. & H. Code[13] does

---

[12] "Counties, as political entities or subdivisions of the state, are governmental agencies, all the powers and functions of which 'have a direct and exclusive reference to the general policy of the state, and are, in fact, but a branch of the general administration of that policy.' 1 Dillon on Municipal Corporations, 5th Ed. § 35; County of Sacramento v. Chambers, 33 Cal.App. 142, 146, 164 P. 613; County of San Mateo v. Coburn, 130 Cal. [631], 636, 63 P. 78, 621; Reclamation Dist. No. 1500 v. Superior Court, 171 Cal. 672, 679, 154 P. 845; Dillwood v. Riecks, 42 Cal.App. 602, 607, 184 P. 35." Watson v. Greely, 67 Cal.App. 328, 337, 227 P. 664, 667.

A county is capable of contracting. House v. Los Angeles County, 104 Cal. 73, 37 P. 796; 20 C.J.S., Counties, § 173.

In certain instances, the State may be bound by the action of a county, 15 C. J. 556; See also 20 C.J.S., Counties, § 199; County of Sierra v. Butler, 136 Cal. 547, 69 P. 418; People v. Holladay, 93 Cal. 241, 29 P. 54, 27 Am.St.Rep. 186; 13 Cal.Jur. 331; 7 Cal.Jur. 388.

The county is a body politic, having charge of public highways therein, and is but a department of the state, exercising certain powers belonging to the state. County of Sierra v. Butler, 136 Cal. 547, 69 P. 418.

Counties, as political entities or subdivisions of the state, are governmental agencies, all the powers and functions of which "have a direct and exclusive reference to the general policy of the state, and are, in fact, but a branch of the general administration of that policy." Watson v. Greely, 67 Cal.App. 328, 227 P. 664; Central Pac. Ry. Co. v. Costa, 84 Cal.App. 577, 258 P. 991.

A county is a governmental agency or political subdivision of the state, organized for the purpose of exercising some functions of the state government. Wilkinson v. Lund, 102 Cal.App. 767, 283 P. 385.

[13] Sec. 100 of the S. & H. Code: "Possession and control of state highways: * * * The Department shall have full possession and control of all *State* highways. The departments authorized and directed to lay out and construct all State highways between the termini designated by law and on the most direct and practicable locations *as determined by the commission,* and to improve and maintain such highways as provided in this code. The department shall maintain any *existing traversable highway* which is between the termini of, and approximately on, any route included in the State highway system. The department may do any act necessary or proper for

not appear to have been construed by any court of this state, this court has the right to interpret this statute for the first time, and, after a careful reading thereof, is of the opinion that the Legislature of this State clearly drew a line of demarcation between *State* highways on the one hand, and *existing traversable highways* on the other; and that it was with this section in mind (then Sec. 363r of the Political Code) that counsel for all sides were so meticulously precise in drawing up their agreements (Exs. E, F and H).

The State contends, however, that the roads in question (highways 77 and 192) having been taken over and maintained by the State, pursuant to legislative authority are actually *State* highways in all respects the same as if originally constructed by the State, relying upon Statutes of 1931, Chapter 82; Statutes of 1933, Chapter 767, § 7, p. 2041 and S. & H. Code, §§ 377, 492 and 24; and that the "record is unassailable that from the very inception, in 1925, of the policy of state maintenance of *traversable roads,* such highways have been considered State highways (Biennial Report of Calif. Highway Comm., 1926, pp. 17, 23, 105; Biennial Report of the Division of Highways, 1934, pp. 15, 85.)" (State's reply brief, p. 27); that "no procedure has been provided for the taking over by the state of *'traversable highways.'* It always has been done by resolution" and that "the state has, in fact, been in possession and control of the highways, and has exercised full and complete jurisdiction over them for a period of years. (Sullivan Vol. II, p. 181, 1, 5, et seq.), * * * 'traversable highways' are to be * * * state highways" (page 31 of defendant's closing brief); while the Government contends, on the other hand, that all the State agreed to do was to maintain the highways as county roads, relying upon the agreements (Exs. E, F and H).

As the Court construes Sec. 100 of the S. & H. Code, supra, the State Highway Commission, now the Department of Public Works, Division of Highways, thereunder could and can maintain any traversable road, pro tempore, without its ipso facto and eo instanti becoming a State highway, although on a route included in the State Highway System, and subsequently order its secession back to the counties. However, even though this Court might be in error in its construction of Sec. 100 of the S. & H. Code, supra, the conclusions of the court that highways 77 and 192, within the Prado Flood Control Basin, were not State highways would not be affected, for the reason that the Department of Public Works, Division of Highways, as the delegate of the State through legislative authority (then the State Highway Commission) had the jurisdiction to fix the status of these highways 77 and 192, through its agreements with the counties in 1931 and 1933 (Exs. E, F and H) which it did in unmistakable language through its resolutions therein; and its resolutions, in the court's opinion are conclusive evidence of this fact.

(18) *Presumptions on the part of State officials that Highways 77 and 192 became State highways cannot prevail in view of the evidence to the contrary:*

Mr. E. Q. Sullivan, District Engineer for the Division of Highways at San Bernardino, testified that the California Division of Highways had been in "full possession and control" of the highways here involved from 1931 and 1933, in which years they were taken over from the counties, and to the present time they have been maintained by the State as other State highways are maintained. (Vol. II of Court Reporters' transcript, p. 181?) The State contends furthermore that such was the contemporaneous and practical construction given the statute by those whose duty it was to carry it into effect, and that such a construction is "always

---

the construction, improvement, maintenance or control of all highways and properties which are under its control, including the construction, *improvement, and maintenance of detours*" (Enacted 1935. Based on former Pol.Code, § 363r, as added by Stats.1933, Ch. 326, § 1,

p. 898; Stats.1927, Ch. 794, § 7, 1st par., as added by Stats.1933, Ch. 767, § 5, p. 2034; Stats.1931, Ch. 82, § 1, 1st sent. p. 102, as amended by Stats. 1933, ch. 106, § 1, p. 562.) (Italics supplied.)

given great respect" (citing 23 Cal.Jur. 775; in Re Valhoff, D.C., 238 F. 405); and that it may "even rise to the dignity of judicial interpretation" (23 Cal.Jur. 770; Healey v. Superior Court, 167 Cal. 22 (14), 138 P. 687, in which the Court is in entire accord, but in this case we are also dealing with the construction and interpretation of agreements (Exs. E, F and H) and the resolutions of the State Highway Commission therein which refutes the contention of the State.[14]

The actions of the State Highway officials in assuming highways 77 and 192 to be *State* highways over a period of years are, of course, entitled to great weight by the court; but, in the face of documentary evidence to the contrary, and the resolutions of the State Highway Commission therein (Exs. E, F and H), presumptions must fall. The agreements (Exs. E, F and H) were entered into between parties well familiar with the distinction between *State* highways and county roads; and, while it is not altogether clear to the court just what the legal qualifications of the counties were at the time they entered into these agreements wtih the State, being in law merely state agencies with limited contractual powers; nevertheless, the Board of Supervisors of San Bernardino County and the State Highway officials were eminently competent to express themselves linguistically, using the English language as a conveyance of their thoughts, as to the legal status of these two highways 77 and 192 within the Prado Flood Control Basin at that time, and the same may be said about the Board of Supervisors of Riverside county and the State Highway Officials relative to highway 77, *or, in any event, what they desired that status to be.*

The State of California, through the State Highway Commission, in addition to meticulously requiring the agreements of the counties to accept relinquishment of the State's obligations to maintain these county roads, if it should thereafter decide that they were not to be included as a part of the State Highway System (Exs. E, F and H), made no provision so far as the personal knowledge of witness Sullivan was concerned for identification or record of them as State highways (Sullivan, Vol. II of Court Reporters' Transcript, page 233, line 16 to page 234, line 19); and there is no showing that the State or the State Highway Commission conformed to any of the permissive modes of record provided for in the S. & H. Code (Sections 128, 129 and 863).[15]

---

14 "Contemporaneous construction by executive officers of the State charged with the duty of executing an ambiguous statute, especially if it has extended over a long period of years, is entitled to consideration and is given great weight by the courts. Indeed, it has been said the courts should not depart from such a construction if it accords with the natural meaning of the statutory words and has not proven to be productive of confusion * * *, or otherwise conflict with the policy of the law." 23 Cal.Jur. 776; Riley v. Thompson, 193 Cal. 773, 778, 227 P. 772; United States v. Philbrick, 120 U.S. 52, 59, 7 S.Ct. 413, 30 L.Ed. 559.

15 Sec. 128, S. & H. Code of Calif.: "Layout sheets and right of way maps: Filing for record. The department may file for record, in the office of the recorder of the county in which any State highway is located, detailed layout sheets and right of way maps showing the boundaries of such State highway and also general route maps of such highway or blue-prints of any such sheets or maps, which the county recorders of the several counties shall accept and file for record without fee. No certificate need be attached thereto other than the usual title of the department showing the approval of such sheets or map by the proper officer or engineer of the department." Enacted 1935, based on former Pol.Code, Sec. 363cc.

Sec. 129, S. & H. Code of Calif.: "Duty of county recorder. Each county recorder shall keep all such State highway maps and sheets, or blueprints thereof, filed in separate map books provided by the department for that purpose and each designated 'State Highway Map Book No. ——, —— County.' Each such map or sheet, or blueprint thereof, shall be numbered in the order of filing and indexed in a separate index showing the number and the date of filing." Enacted 1935. Based on former Pol.Code, Sec. 363cc.

Sec. 863, S. & H. Code of Calif.: "Right of way map: Filing: Delineation of boundaries. A right of way map shall be filed as provided in section 128, show-

According to Mr. Sullivan, there was no record of any kind, excepting the agreements (Exs. E, F and H), which showed that the State Highway Commission had made an adoption of the location of either of these roads as *State* highways.

If the State's contention could be correct that highways 77 and 192, within the Prado Flood Control Basin, were actually *State* highways on January 3d, 1944, when the deeds were executed by the counties of San Bernardino and Riverside to the Government (Exs. 70 and 71 respectively), either because of State statutes making them such, or because the State Highway Commission assumed them to be State highways and acted accordingly, whenever the transmutation of these highways took place, i. e., from those of county roads in 1931 and 1933 to State highways in the interim, is purely within the realm of conjecture, and not subject to judicial proof. No state statute has been called to the Court's attention, enacted prior or subsequent to 1931, which would, in the court's opinion, cause such a transition, eo instanti; and merely thinking that they were State highways, or assuming them to be so and acting accordingly, on the part of the State Highway Officials or the Boards of Supervisors of these counties, certainly could not in fact, and did not in law, cause their transmutation, ex proprio vigore, into State highways, in the light of agreements (Exs. E, F and H) to the contrary.

(19) *Agreements between the United States and the Counties of Riverside and San Bernardino (Exs. M and N respectively)*:

Assuming again that the State's contention could be correct that highway 77 was a *State* highway on June 21, 1943, when the contract between the United States and the county of Riverside was entered into (Ex. M), and that highways 77 and 192 were *State* highways on July 6, 1943, when the contract between the United States and the County of San Bernardino was entered into (Ex. N), it is not clear to the court why the Government and the counties should have entered into these agreements, inter se, for the benefit of the State of California as a third party beneficiary, i. e., why the State did not enter into these agreements with the Government as principal, for the counties are mere agents of the State.[16]

This statement is partially answered by the defendant, however.[17]

---

ing such boundaries as are claimed by the State. Such map shall delineate such boundaries to be established with sufficient detail to enable the line to be located on the ground by survey." Added by Stats. 1935, p. 1876. See Stats. 1935, p. 301.

[16] The rule as to suits against the state applies to each of the counties as agencies of the State. Liebman v. Richmond, 103 Cal.App. 354, 284 P. 713.

A county is not a person in any sense; it is not a corporation. It cannot sue or be sued, except where specially permitted by statute, and such permission can be withdrawn or denied at any time the legislature may think proper. Hunsaker v. Borden, 5 Cal. 288, 63 Am.Dec. 130.

The law of private contracts is not applicable where the county government is a party, in respect of the mode or measure of enforcement. The county government is a part of the state government, which is sovereign and the state government, neither in its general nor local capacity, can be sued by her creditors or made amenable to judicial process, except by her own consent. Sharp v. Contra Costa County, 34 Cal. 284.

[17] "In view of the fact, however, that these agreements (Exs. M and N) obligated the counties to initiate proceedings and to vacate and abandon the existing State Highways (Routes 77 and 192), it may be asked how such action would be legally possible in view of the position of the defendant here that the highways in question are, in fact, state highways in the possession and control of the Department of Public Works. The answer is that the contracts did not obligate the Counties to initiate such proceedings *until completion of the work of relocating the State highways*, when the highways in question would have been relinquished to the Counties by the State.

"Section 73 of the Streets and Highways Code provides that the California Highway Commission may 'relinquish to any county * * * any portion of any State highway within such county * * * which has been superseded by relocation, for use as a county highway.'

(20) *Deeds from the Counties of San Bernardino and Riverside, dated January 3rd, 1944 (Exs. 70 and 71 respectively):*

As a justification for the execution of the deeds by the Counties of San Bernardino and Riverside to the United States, (Exs. 70 and 71 respectively), and in further exemplification of the Government's contention that the counties at the time believed that highways 77 and 192 were in fact county roads and not *State* highways (although the deed from San Bernardino County to the United States (Ex. 70) specifically mentions highway 77 as a *State* highway, and describes Highway 192 by its legal description; and the deed from Riverside County to the United States (Ex. 71) specifically mentions Highway 77 as a *State* highway, but does not mention Highway 192, as no portion of highway 192, within the Prado Flood Control Dam and Basin, was within the County of Riverside), it states that "these officials must have been aware of the law as set forth in the political code and the Streets and Highways Code that the sole right to vacate and abandon *State* highways was vested in the State Highway Commission (S & H Code, §§ 835–837), that the only power vested in the counties in reference to abandonment was to county roads (S. & H. Code § 901)" * * * and that "they must have known that the counties had no possible right to contract away (by stipulation, judgment or deed) rights which were exclusively vested in the State Highway Commission" (Government's Brief, pp. 37 and 38); while the State declares "How it came about that these deeds which, presumably, were prepared by the Army Engineers and by them submitted to the counties for execution, also included descriptions of the *State* highways (when the contracts (Exs. M and N) provided only for abandonment upon their relocation), is one of the unexplained mysteries of this case." (Defendant's Opening Brief, pp. 27, 28.)

In recapitulation, it is the opinion of the Court:

(1) That at the time the agreement between the County of San Bernardino and the State was entered into in 1931 (Ex. E); the agreement between the County of Riverside and the State was entered into in 1931 (Ex. F); and the agreement between the County of San Bernardino and the State was entered into in 1933 (Ex. H), that the State was taking over these roads or highways 77 and 192 as traversable county roads for *maintenance only* and not as *State* highways, pursuant to Section 100 of the S. & H. Code; and that the resolution of the State Highway Commission in each of these three agreements (Exs. E, F and H) conclusively fixed the status of the highways therein specifically designated as county roads, as a matter of law and in fact, and that they will continue to remain county roads until the Board of Public Works, Division of Highways, passes another valid resolution, executed with the

---

"The established policy is to relinquish all highways superseded by relocation to the respective counties or cities in which they are located. Such action is mandatory as a matter of law, unless, in a particular case, the highway is abandoned or the legislature has authorized more than a single route between the same termini, which is not the case here. (Streets and Highways Code, Sec. 835.)

"Had the Government proceeded, as it agreed, to relocate the existing State highways, the California Highway Commission, upon completion of such relocation, would have been in a position to relinquish to the counties the existing highways within the basin in accordance with provisions of Section 73. The highways then would have passed to the jurisdiction of the counties, and, in that event, would have been subject to abandonment proceedings in accordance with provisions of the Code authorizing counties to take such action. (Streets and Highways Code, Secs. 954 et seq.)

"It is plain, however, on the record here, that, until such action is taken by the Commission, no authority over the highways in question is vested in the Counties of San Bernardino and Riverside. (Defendant's Exhibits E, F, G and H.)

"The instruments from the counties (Government's exhibits 70 and 71) granting flowage easements over certain county highways, therein described, purport to grant such rights over the state highways here in question, the State highways having been included among the highways described in the deeds." (From defendant's opening brief pp. 26 and 27.)

same solemnity and formality, changing their status;

(2) That they were not deemed to be *State* highways but county roads by the State Highway Commission and the Board of Supervisors of each of these two counties at that time, who well recognized the distinction between these two types of roads or highways;

(3) That as a matter of fact, and in law, i. e., from an analysis of the evidence, oral and documentary, produced at the pre-trial hearing, and from an examination of the State statutes that have been called to the court's attention (supra), there has been no law passed which would, ipso facto, cause a transmutation of these county roads into *State* highways, in contravention of the agreements of the counties and the State (Exs. E, F and H);

(4) That presuming them to be *State* highways by the State Highway Commission and/or the Department of Public Works, Division of Highways, would not and could not, in law or in fact, change their legal status;

(5) That as a matter of fact, and in law, they were not *State* highways when agreements (Exs. M and N) were entered into between the Government and the counties in 1943; and

(6) That as a matter of fact, and in law, they were not *State* highways when the deeds were executed by the counties to the Government (Exs. 70 and 71) in January of 1944.

How this ratiocination on the part of the Court will affect the ultimate conclusion of this opinion will be discussed under the subject of estoppel (infra).

### Estoppel:

(21) *Allegations of defendant's second defense in its answer:*

The defendant, State of California, for a second defense in its answer, alleges substantially as follows:

(1) That on the third day of June, 1938, said Orange County Flood Control District and this defendant entered into an agreement (Ex. K), wherein and whereby said district agreed, among other things, to relocate and reconstruct, at the expense of said district, a portion of State Highway Routes 77 and 192, to the extent that said highways, or portions thereof, were affected or destroyed by the construction of said dam in the name of the State of California and at the expense of said district, and to grant to the State of California the right to use and maintain a roadway for State highway purposes over and across said Prado Dam;

(2) That, subsequent to the adoption of said Flood Control Act of 1938, approved June 28, 1938, Public No. 761, 75th Congress, Chapter 795, 3rd Session, plaintiff entered into negotiations with defendant for the relocation of said State Highways 77 and 192, and each of them, as contemplated by and provided for in said agreement of June 3, 1938, between said Orange County Flood Control District and this defendant;

(3) That, on or about the 6th day of May, 1943, plaintiff agreed with this answering defendant (Ex. L) that plaintiff would, at its expense, relocate and reconstruct said State highways (Routes 77 and 192) as required by said dam and flood control project, and agreed upon locations therefor outside or above the area flooded as a result of the construction and operation of said dam and flood control project;

(4) That, on or about the 21st day of June, 1943 (Ex. M), plaintiff entered into an agreement with the County of Riverside that plaintiff would either singly, or in conjunction with the State of California, cause State Highway Route 77 to be relocated;

(5) That, on or about the 6th day of July, 1943 (Ex. N), plaintiff entered into an agreement with the County of San Bernardino that plaintiff would either singly, or in conjunction with the State of California, cause State Highway Routes 77 and 192 to be relocated; and

(6) That defendant, relying on the promises of plaintiff in the agreement between the Orange County Flood Control District and defendant, dated June 3, 1938 (Ex. K); the (oraly?) negotiations between the plaintiff and defendant subsequent thereto, as contemplated by, and provided for, in the

said agreement of June 3, 1938, between said Orange County Flood Control District and this defendant; the agreement between plaintiff and defendant of May 6, 1943 (Ex. L); the agreement between plaintiff and the County of Riverside, dated June 21, 1943 (Ex. M); and the agreement between plaintiff and County of San Bernardino, dated July 6, 1943 (Ex. N), took no action to provide for the relocation of said State Highways 77 and 192, during which time the cost of construction has steadily increased, all to the defendant's damage as aforesaid; and, by reason thereof, the court understands the defendant to contend that the Government is estopped to deny liability.

(22) *Quaere: Is the United States estopped to deny that the State has an interest in these highways 77 and 192?*

▆▆▆ There was introduced into evidence at the pre-trial hearing an agreement dated June 3, 1938, by and between ·the Orange County Flood Control District and the State of California (Ex. K), whereby the District proposed "to acquire lands and rights of way for and to construct a * * * dam in the Santa Ana River, in the vicinity of Prado, * * * and to relocate and reconstruct, at its expense, subject to the provisions of this agreement, such portions of said State highway Routes * * * 77 and 192, which may be affected or destroyed. * * *" The United States was not a party to this agreement, and at that time, under the 1936 Act, supra, the United States had no authority to acquire or pay for the taking·of the easements necessary for the construction of Prado Dam. The court' knows of no principle of law whereby the Government can be bound by this agreement.

The memorandum (Ex. L), indicating a date of the meeting of May 6, 1943, indicates nothing to the court but a memorial of a discussion that had taken place between the representatives of the U. S. E. D. and the State Division of Highways relating to the relocation of these highways through the Prado Dam site.

(23) *Agreements between the United States and the counties of Riverside and San Bernardino (Exs. M and N):*

In the contract entered into on June 21, 1943, between the United States and the county of Riverside (Exhibit M), highway No. 77 is specifically mentioned as "State Highway No. 77" and the Government agrees therein "either singularly, or in conjunction with the State of California, or otherwise, (to) cause *State* Highway No. 77 to be relocated * * *"; and, in the contract entered into on July 6, 1943, between the United States and the county of San Bernardino (Exhibit N), Highways Nos. 77 and 192 are specifically mentioned as *"State* Highways" in several places; and the Government agrees therein "either singularly or in conjunction with the State of California, or otherwise (to) cause *State* Highways Nos. 77 and 192 to be relocated * * *." The State takes the position (Defendant's Opening Brief, p. 23) that the admissions of the Government in Exhibits M and N that the highways are State highways are conclusive of this fact.

▆▆▆ The Government does not doubt that these roads were colloquially regarded and referred to as temporary possible locations of State highways or even as temporary locations of State highways, but contends that such colloquial reference would have no legal status. It would, of course, be unconscionable to expect this Court to believe, and the Court does not believe, that these technical agreements entered into between the United States and the county of Riverside (dated June 21, 1943—Ex. M), and with the county of San Bernardino (dated July 6, 1943—Ex. N), were drawn up and executed without a careful consideration being given to the nomenclature used therein, and that the Government would have permitted these highways 77 and 192 to be designated as State highways if it had believed otherwise at the time; nevertheless, designating them as *State* highways was the ipse dixit of each of the contracting parties thereto (more in the nature of description and identification than anything else), and did not make them so in fact, if they were not *State* highways in law.

The ratio decidendi of the Court in coming to the conclusion that highways 77 and

192 were not actually *State* highways, in fact and in law, at the time the contracts (Exs. M and N), and the deeds (Exs. 70 and 71) were executed, leaves the Court no alternative (in rendering its opinion on the applicability of the doctrine of estoppel in this case contended for by the defendant) but to decide precedently that the Government is not bound by this nomenclature in that there was either a bilateral mistake of fact on both sides, or a unilateral mistake of fact on the part of the Government, when highway 77 was described as a *State* highway in the contract between the Government and the county of Riverside, dated June 21, 1943 (Ex. M); and highways 77 and 192 were described as *State* highways in the contract between the Government and the County of San Bernardino, dated July 6, 1943 (Ex. N).

The Court prefers to look upon this situation as a unilateral mistake of fact on the part of the Government in thinking at the time, and in good faith, that the highways mentioned in these agreements (Exs. M and N) were *State* highways; and, under California law, an estoppel will not lie against a party who has entered into an agreement by an innocent mistake.[18]

The Government would not have agreed to relocate these highways for the State if it had not believed in good faith that they were in fact *State* highways, in other words, the mistake of fact on the part of the Government went to the root of the agreements.

"No estoppel arises where the representation or conduct of the party sought to be estopped is due to ignorance founded upon an innocent mistake. And while there is authority to the contrary, the weight of authority is that the acts and declarations of a party based upon an innocent mistake as to his legal rights will not estop him to assert the same, especially where every fact known to the party sought to be estopped is equally well known to the party setting up the estoppel." 21 C.J. p. 1125–1126; see also 31 C.J.S., Estoppel, § 70.[19]

---

[18] Cal.Civil Code, Sec. 1576, "Mistake, what. Mistake may be either of fact or law."

Cal.Civil Code, Sec. 1577, "Mistake of fact. Mistake of fact is a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in:

"1. An unconscious ignorance or forgetfulness of a fact past or present, material to the contract; or,

"2. Belief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed."

In California, under Civ.Code, Sec. 1689, providing that a party to a contract may rescind it if his consent was given by mistake, while the mistake may be one of fact, as defined by Sec. 1577, or of law, as defined by Sec. 1578, in which latter case the mistake must be by both parties, not only must the mistake be one but for which the party would not have consented to the contract, Sec. 1568 declaring that consent is deemed to have been obtained through mistake "only when it would not have been given had such cause not existed," but in case of mistake of fact, the mistake must be "material to the contract," this being an element of a mistake of fact as defined by Sec. 1577, Hannah v. Steinman, 159 Cal. 142, 147, 112 P.

1094; Moore v. Copp, 119 Cal. 429, 51 P. 630, (13 C.J. Note 54, p. 374. See also 17 C.J.S., Contracts, § 143.)

It is not necessary that a mistake of fact be mutual; nor is it true that a contract cannot be set aside for the mistake of one of the parties unless the contract was induced and the mistake arose from the fraud of the other party. Forest Lawn Memorial Park Ass'n v. DeJarnett, 79 Cal.App. 601, 250 P. 581.

It is not necessary in an action to rescind on the ground of mistake that the mistake be mutual, and under Civ.Code, Sec. 1577, such an action may be based upon the mistake only of the party prosecuting the action. Lepper v. Ratterree, 98 Cal.App. 245, 276 P. 1037.

[19] There can be no estoppel where the facts are not known. Wheaton v. North British & M. Ins. Co., 76 Cal. 415, 18 P. 758, 9 Am.St.Rep. 216; Puterbaugh v. Wadham, 162 Cal. 611, 123 P. 804: To constitute an estoppel it must be made to appear that one acted with full knowledge of all the material facts and circumstances and with full knowledge of his rights in the premises. Estate of Cover, 188 Cal. 133, 204 P. 583. There can be no estoppel when the facts are not known, as no one can be presumed to have waived that the existence of which he has not known. Norton v. Overholtzer, 63 Cal.App. 388, 218 P.

"* * * as a corollary to the proposition that the party setting up an estoppel must have acted in reliance upon the conduct or representations of the party sought to be estopped, it is as a general rule essential that the former should not only have been destitute of knowledge of the real facts as to the matter in controversy, but should have also been without convenient or ready means of acquiring such knowledge. One relying on an estoppel (in this case the State) must have exercised such reasonable diligence as the circumstances of the case require. If he conducts himself with a careless indifference to means of information reasonably at hand, or ignores highly suspicious circumstances which should warn him of danger or loss he cannot invoke the doctrine of estoppel." 21 C.J. pp. 1129, 1130; see also 31 C.J.S., Estoppel, § 71.[20]

The Court cannot see where the State has been mislead by the Government as to the status of these highways, the records thereof were in its possession; and, under the doctrine of agency, the knowledge of the counties was the knowledge of the State itself. In this case the estoppel is sought against the Government and the rule is even more restricted. As stated by the Government, the defense of estoppel is strictly construed, and this is particularly true where the Federal Government is concerned, and the proceedings are an exercise of its sovereign power of eminent domain.[21]

The Court is fully cognizant of the fact that the Government has made no effort to fulfill its agreements with the counties (Exs. M and N) to relocate from within the Prado Basin the portions of alleged State Highways 77 and 192, and takes the position, inter alia, that "the contract(s) are so completely ambiguous, unintelligible, conflicting and void as to create no rights or obligations as respects the relocation of the alleged *State* highways" (Government's Brief, p. 46). The Court is sympathetic with the State's contention that "the Government cannot, in good conscience, accept from the counties the abandoned and vacated highways (which has,

---

637; there can be no estoppel in pais where the party against whom the attempt is made to invoke such estoppel does not know the full truth of the facts to which his conduct, declarations or representations constituting the basis of the alleged estoppel relate. Bisconer v. Billing, 71 Cal.App. 779, 236 P. 329. There can be no estoppel where the facts are not known, Hacker Pipe & Supply Co. v. Chapman Valve Mfg. Co., 17 Cal.App.2d 265, 61 P.2d 944.

20 Person claiming benefit of estoppel must show that he was mislead by conduct of other party. Washington v. Black, 83 Cal. 290, 23 P. 300. It is an essential element of estoppel by conduct that the party claiming the estoppel should have relied upon the conduct of the other, and was induced by it to do something which he would not otherwise have done. McCormick v. Orient Ins. Co., 86 Cal. 260, 24 P. 1003. It is an essential element of estoppel by conduct that the party claiming the estoppel should have relied upon the conduct of the other, and was induced by it to do something which he otherwise would not have done. First Nat. Bank v. Maxwell, 123 Cal. 360, 55 P. 980, 69 Am.St.Rep. 64. The person asserting an estoppel must be induced to act or refrain from acting by his opponent's conduct. Kemp-

er v. Industrial Acc. Comm., 177 Cal. 618, 171 P. 426. An estoppel cannot occur unless the one to be estopped has, by some act or omission, induced another to believe in the existence of a particular state of facts and the other acts on such belief to his prejudice. Traders' Credit Corporation v. Radin & Camp., Inc., 131 Cal.App. 479, 21 P. 461. One pleading an estoppel must be ignorant of the true state of facts and must have been intentionally misled by the act of the other. Moss v. Underwriters' Report, Inc., 12 Cal.2d 266, 83 P.2d 503; Maggini v. West Coast Life Ins. Co., 136 Cal.App. 472, 29 P.2d 263; Killian v. Conselho Supreme Da Uniao, etc., 31 Cal.App.2d 497, 88 P.2d 214.

21 The United States cannot be estopped by the unauthorized or fraudulent acts of its agents or officers, or their mistakes. United States v. Lee Wilson & Co., D.C., 214 F. 630, affirmed, 1915, 8 Cir., 227 F. 827; 245 U.S. 24, 38 S.Ct. 21, 62 L.Ed. 128. The U. S. is not bound or estopped by the acts of its agents, United States v. Chamberlain, D.C., 51 F.Supp. 54. "Ordinarily the government is not estopped from the exercise of necessarily inherent powers, such as eminent domain." United States v. Certain Parcels of Land, D.C., 55 F. Supp. 257, 262.

in fact, been done) and the grants of flowage easements over the other county highways and refuse to provide, for the public, the necessary highways outside the basin which, in June and July of 1943, it freely agreed were required and necessary and for the best interests of 'all parties concerned',." (Defendant's Opening Brief, p. 29); but in view of the fact that the Court is holding that highways 77 and 192 are not *State* highways; and, ex necessitate rei, must consistently hold that there was a unilateral mistake of fact on the part of the Government when it entered into these contracts with the counties (Exs. M and N) as a predicate for its conclusion that the Government is not estopped to deny its alleged liability to relocate these two highways for the State, and is basing its decision on that ground, the Court specifically refrains from commenting on the misfeasance or nonfeasance, culpable or otherwise, on the part of the Government in not fulfilling its alleged obligation under the agreements in question. *It is to be specifically noted that no intimation is being given in this opinion as to what the court's opinion might have been as to the Government's liability to relocate these highways under the Agreements (Exs. M and N), or the State's rights thereunder as a third party beneficiary, if it were holding these highways were State highways; and it is releasing the Government from its promise thereunder on the sole ground that there has been at least a unilateral mistake of fact on the part of the Government, if not a bilateral mistake of fact on the part of both parties, in thinking that they were State highways.*

(24) *The State of California, for whose benefit the contracts (Exs. M and N) were entered into, in no better position than the counties:*

Where an agent enters into an agreement in behalf of the principal (in this case the counties in exhibits M and N represented the State as its agents in dealing with the Federal government) the Court sees no reason why the State should not be bound by the interpretation of the agreements (Exs. M and N) by the court, and why the third party beneficiary thereunder (the State) should obtain any better position under the contracts than the principals themselves. On the theory that these were *State* highways the State takes the position that the legal status of the counties and their legal relationship to the State were such as to uphold the validity of the contracts in question; that "the counties had power to represent the State" (Defendant's Opening Brief, p. 25) and that "the State is a beneficiary of the contracts (Exs. M and N), (Defendant's Opening Brief, p. 26), under the doctrine of agency; and, while under Sec. 1559 of the Civil Code of California (enacted in 1872) "a contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it"; the Court, a fortiori, sees no reason why the State, as a third party beneficiary, should not be bound by the decision of the court that there has been a unilateral mistake of fact on the part of the Government in their execution. "The rights of a person for whose benefit a contract is made are subject to the equities growing out of the contract between the original parties." (17 C.J.S., Contracts, § 415.) See Pacific American Gasoline Co. of Texas v. Miller, Tex.Civ.App., 76 S.W. 2d 833. "[A] third party beneficiary's right of action on a promise cannot rise higher than the rights of contracting party through whom he claims." Seward v. South Florida Securities, 5 Cir., 96 F.2d 964, 967. The question of the validity and enforceability of contracts made in behalf of the Government for the acquisition of property for federal purposes involved in Muschany et al. v. United States, 1945, 324 U.S. 49, 65 S.Ct. 442, 89 L.Ed. 744; is not in point here in view of the court's ruling on estoppel.

(25) *Deeds of January 3, 1944 (Exs. 70 and 71):*

The deed, dated January 3, 1944, between the county of San Bernardino and the United States (Ex. 70), and the deed, dated January 3, 1944, between the county of Riverside and the United States (Ex. 71), which latter at least was prepared by the Government, specifically refer to highway 77 as a *State* highway; and it is like-

wise impossible for the court to believe that these technical documents were drawn up and executed without a careful consideration being given to the phraseology used, and that the Government and the counties would have permitted highway 77 to be designated as a *State* highway if they had believed at the time that they were dealing exclusively with county roads. However, for the same reason that the designation of highway 77 as a *State* highway in the contract (Ex. M), and of highways 77 and 192 as *State* highways in the contract (Ex. N), cannot create an estoppel against the Government to deny this fact, for such designation was based upon at least a unilateral mistake of fact on the part of the Government; neither can such a designation prejudice the Government in the deeds (Exs. 70 and 71).

The State contends that part of the consideration for these deeds (Exs. 70 and 71) was the promise of the Government to relocate highway 77, within the Prado Flood Control Basin, in the county of Riverside (Ex. M); and to relocate highways 77 and 192, within the Prado Flood Control Basin, in the county of San Bernardino (Ex. N), for the State (defendant's opening brief p. 10); and that the deeds should not have been executed until the Government had fulfilled its obligations under the agreements (Exs. M and N); and are, therefore, without validity (Defendant's Reply Brief, pp. 34–36).

While it is not necessary for the Court, for the reasons heretofore stated, to pass upon this point of law, it would appear to the court, by way of obiter dictum, that the two deeds from the counties of San Bernardino and Riverside to the Government (Exs. 70 and 71 respectively), are not void by reason of their describing Highway 77 as a *State* highway, on the theory that this language is merely descriptive and surplusage [22]; and, if they were *State* highways, title has likewise passed.

(26) *Conclusions of the court:*

This is not a case in equity where one of the parties is non compos mentis and has been defrauded, and is appealing to the conscience of the Chancellor for equitable relief, but a case involving primarily the legal construction of State statutes and contracts, particularly the agreements (Exs. E, F and H) entered into by parties thoroughly familiar with the subject matter after mature consideration of several months' duration with the aid of counsel highly skilled in the legal intricacies involved in the status of State highways and county roads, and the legal repercussions arising in the use of inapt nomenclature.

This decision is concededly reluctantly rendered by the Court because of its regrettable consequences to the State, but the Court did not make the agreements for the parties herein, and is compelled to interpret the law as it believes it should be interpreted in this case. In any event, it should be remembered that the litigants herein are not private persons but sovereignties; and the public, state and/or federal, will eventually pay for the relocation of these highways, if, as and when they are relocated. Bonus judex debet judicare secundum allegata et probata.

The Court is necessarily constrained to find in favor of the Government on the issues discussed, inter alia, that highways 77 and 192, within the Prado Flood Control Basin, were not *State* highways when agreements (Exs. E, F and H) and the contracts (Exs. M and N) were entered into, or thereafter; that the deeds (Exs. 70 and 71) and the aforementioned stipulated judgments against the two counties, pursuant thereto, have heretofore vested all flowage rights and easements in highways 77 and 192, within the Prado Flood Control Basin, in the Government, and that the State has no right, title or interest therein.

For the reasons heretofore given, it will not be necessary for the Court to discuss

---

[22] "* * * nor will the conveyance be defeated because other circumstances are added which are inapplicable or false, if from any part of the description contained in the deed *the premises intended to be conveyed* clearly appear." (Citing cases.) (26 C.J.S. Deeds, § 30, p. 220.) See also Leonard v. Osburn, 169 Cal. 157, 146 P. 530, 532; Hall v. Bartlett, 158 Cal. 638, 112 P. 176; Helm v. Wilson, 76 Cal. 476, 18 P. 604; Irving v. Cunningham, 66 Cal. 15, 4 P. 766; McKeon v. Millard, 47 Cal. 581; Borchard v. Eastwood, 6 Cal.Unrep. 736, 65 P. 1047.

the other points raised at the pre-trial hearing, which are hereby mooted.

Counsel for the respective sovereignties will take such further action in the premises as they may deem advisable.